# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

$\mathfrak{Supreme}$ $\mathfrak{Court}$ $\mathfrak{of}$ $\mathfrak{Kentucky}$ FINAL

2005-SC-000804-MR

DATE 9-13-07 _____

ANDREW DEAN COULTHARD                                    APPELLANT

ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE THOMAS L. CLARK, JUDGE
V.                                  NO. 04-CR-000647

COMMONWEALTH OF KENTUCKY                                 APPELLEE

**OPINION OF THE COURT BY JUSTICE SCOTT**

**<u>AFFIRMING</u>**

Appellant, Andrew Dean Coulthard, was convicted by a Fayette County jury of manslaughter in the first degree and tampering with physical evidence. For these crimes, Appellant was sentenced to a total of twenty-five years in prison. Appellant now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). For the reasons set forth herein, we affirm Appellant's convictions.

On November 13, 2003, Appellant fatally shot eighteen-year-old Brian Brown in the neck. At trial, Appellant claimed he went looking for Brown that night because he believed that Brown burglarized his home earlier in the month. Eventually, Appellant found Brown in his vehicle at a stop sign in the trailer park where Brown lived with his grandmother. Appellant testified that he drove his vehicle in front of Brown's, forcing Brown to stop. Appellant then exited his

vehicle and confronted Brown about burglarizing his home. During their brief conversation, Appellant's passenger, Robbie Burns, moved from the passenger seat and maneuvered Appellant's vehicle so that it was facing Brown's vehicle. When Appellant heard a truck coming towards their vehicles, Appellant testified that he quickly attempted to punch Brown through the half-open window of Brown's car. Upon walking back toward his car, Appellant claimed that Brown suddenly started driving towards him in an attempt to run him over. In fact, Appellant stated that Brown actually collided with his vehicle. In reaction and out of fear for his life, Appellant testified that he pulled a gun from his pants and shot towards Brown's vehicle. Appellant admitted fleeing the scene and disposing evidence related to the crime.

At trial, the Commonwealth presented a slightly different version of events. The Commonwealth's evidence tended to show that Appellant did indeed confront and attempt to assault Brown by forcing his way into Brown's vehicle. However, when Brown drove away from Appellant in an attempt to flee, Appellant opened fired and instantly incapacitated Brown with a bullet to the neck. Once incapacitated by the bullet, Brown's vehicle sideswiped two neighborhood vehicles before crashing into and stopping against a third vehicle. It was the Commonwealth's position that the evidence did not support a suggestion that Brown may have collided with Appellant's vehicle prior to sideswiping and crashing into the three other vehicles located at the scene.

Appellant was subsequently apprehended, arrested, and charged with the murder of Brown. On September 1, 2005, a Fayette County jury found Appellant guilty of manslaughter in the first degree and tampering with physical evidence.

A final judgment was entered against Appellant on October 5, 2005. Appellant now appeals directly to this Court as a matter of right and we affirm.

## I. There was no error regarding victim "propaganda," emotional reactions from spectators, or evidence regarding victim impact / background.

In his first assignment of error, Appellant attempts to lump several alleged errors which he claims, in accumulation, amount to reversible error. These alleged errors include the use of "victim propaganda," the refusal of the trial court to grant a mistrial after the jury witnessed emotional reactions from spectators, and the improper utilization of victim impact evidence. Upon review of each of these issues, we find no errors, either individually or cumulatively, which entitle Appellant to a new trial.

Appellant first argues the trial court erred when it overruled his motion to eliminate "propaganda" from the courtroom during Appellant's trial. Notably, Appellant's counsel claimed that he saw family members wearing t-shirts portraying the victim's photograph prior to trial and license plates in the parking lot which supported the victim. Appellant also stated that he was forced to ask the Court for escorts to assist in the arrival and departure of his family members due to harassment and aggressive behavior from spectators.

During a hearing on the matter, Appellant asked the trial court to ban the t-shirts from the courtroom and to order the Commonwealth to talk with the victim's family members regarding appropriate courtroom attire. Although noting that it had not seen any of the t-shirts or inappropriate behavior, the trial court complied with Appellant's requests and asked the Commonwealth to ensure that the victim's family members dress appropriately for the trial. The trial court noted

3

that although it was not granting Appellant's motion at that time, the issue would remain "open" and "subject to change" should he encounter any inappropriate conduct. Eventually, the trial court issued an order overruling Appellant's motion regarding "propaganda."

Appellant now complains that he was denied his right to a fair trial by the trial court's "refusal to exclude propaganda from the courtroom." See Norris v. Risley, 918 F.2d 828, 832 (9th Cir. 1990) ("Where fair trial rights are at significant risk, however, the first amendment rights of trial attendees can and must be curtailed *at the courthouse door*.")(Emphasis added). Appellant's argument could possibly have merit if he were able to cite to any "propaganda" displayed in the courtroom during the trial or which was viewed by the trial jury at any time. Yet, he cannot do so. Rather, Appellant's argument is based on the alleged presence of such propaganda "at one time prior to trial" and speculation as to whether cars *outside the courthouse* contained the aforementioned license plates. Thus, no error occurred.

Appellant next alleges he was unduly prejudiced by emotional outbursts in front of the jury from spectators in the courtroom. The alleged "outbursts" occurred during the Commonwealth's direct examination of Evidence Technician Tim Russell. Russell testified about the evidence collected at the crime scene. Approximately thirty minutes into Russell's testimony, the Commonwealth rapidly introduced a series of five photographs which depicted the victim as he was found in his vehicle. Upon review of the record, soft sobbing can be heard during the brief period of time when photographs of the victim are displayed. The record

4

also seems to depict spectators leaving the courtroom as they were instructed to do if they became overwhelmed during the trial.

After the brief series of photographs, Russell continued to testify regarding additional photographs and evidence found at the scene. Eventually, the Commonwealth displayed another picture of the victim in which blood is seen on the back of his neck. Soft sobbing once again can be heard and Appellant's counsel asked to approach the bench. Due to the emotional nature of the situation, Appellant's counsel requested a recess, which the trial court granted.

Upon return from the recess, Appellant made a motion for mistrial based not on the sobbing which occurred in the courtroom prior to the recess, but on an incident which Appellant's counsel stated he witnessed after the recess. He reported that he saw several family members on the floor sobbing outside of the courtroom. Unfortunately, the jury had walked past these family members and according to Appellant's counsel, some of the jury members began "busting up" themselves.

The trial court overruled Appellant's motion for mistrial, noting that Appellant himself was sobbing and weeping in front of the jury to a far greater extent than any of the spectators or family members and that he witnessed no "substantial outbursts" from the family. The trial court stated that in the future, the jury would be taken out the back of the courtroom to avoid any further problems. Finally, the trial court addressed the audience and advised them that if they could not maintain their composure during the presentation of the evidence, they must leave the courtroom. After this admonition to the audience,

5

there were no additional emotional displays during the remainder of the presentation of the evidence.

Appellant argues that the cumulative effect of the aforementioned emotional displays entitled him to a mistrial. However, it is important to note that Appellant's motion for mistrial was not based on the soft sobbing which occurred during the brief series of photographs that depicted the victim. In that instance, Appellant asked for and received his requested remedy - a recess. Rather, Appellant's motion for mistrial was based solely on the emotional display which Appellant's counsel stated he witnessed in the hallway outside the courtroom. It was the jury's reaction to that display which Appellant's counsel argued entitled his client to a mistrial.

When there is some kind of emotional display by victims or their family members, this Court has held that an admonition to the jury to disregard the display is more than sufficient to cure any possible prejudice that might occur from the situation. See Blackburn v. Commonwealth, 247 S.W.2d 528, 530 (Ky. 1952) (admonition sufficient to cure any prejudice resulting when clothing worn by victim was displayed, victim's widow screamed, cried, became hysterical and was escorted from the courtroom); Belt v. Commonwealth, 2 S.W.3d 790, 793 (Ky. App. 1999) (admonition remedied any prejudice caused during cross-examination when victim screamed at and shouted obscenity at defendant while jurors were being led from courtroom). In holding as such in these cases, we have noted the following:

> It is a frequent occurrence in homicide cases that the next of kin or other close relatives, under the stress of testifying, or when confronted with personal belongings of the deceased, become emotionally upset, cry, and lose their composure. These are

6

> matters that cannot be anticipated and cannot be prevented by denying such persons the right to be present in the courtroom during the trial.

Jackson v. Commonwealth, 275 S.W.2d 788, 789 (Ky. 1955), see also Blackburn, 247 S.W.2d at 530. Thus, the trial court did not err in overruling Appellant's motion for mistrial because a mistrial was not the appropriate remedy in this situation. Rather, the appropriate remedy, if Appellant had asked for it, would have been an admonition to the jury.

Appellant complains that since the trial judge did not issue such an admonition, he was prejudiced and deserves a new trial. However, this exact argument was made and rejected in Jackson, supra. In that case, the Court held as follows:

> Had counsel for [A]ppellant requested the court, it would have been the duty of the court to admonish the jury concerning such disturbance. However, since no such request appears to have been made, the failure to give the admonition and the conduct complained of are not considered prejudicial. The court properly refused to discharge the jury.

Id. at 789.

We find similar holdings in Lanham v. Commonwealth, 171 S.W.3d 14, 32 (Ky. 2005)(no reversible error where several members of victim's family began crying when photos detailing the crime scene and the victim's injuries were introduced, even in spite of lack of admonition from trial judge) and Merrifield v. Commonwealth, 268 S.W.2d 405, 408 (Ky. 1954)(weeping by victim's widow and corresponding "histrionics" by Commonwealth's attorney did not create reversible error in case where trial judge failed to admonish the jury to disregard the emotional displays). In fact, in Lanham, the case whose facts most closely align with the facts in this case, this Court held accordingly:

7

> The victim's family members were understandably upset by the presentation of the crime scene photos, but as the trial judge recognized, the family members were 'being fairly restrained under the circumstances.' As such, their crying was not the sort of emotional outburst that would inflame the jury's passions, and thus it did not rise to the level of error.

171 S.W.3d at 32.

In hindsight, we agree with Appellant that an admonition to the jury would have been desirable in this case. However, an admonition was never requested and thus, any claim that Appellant was prejudiced by the lack thereof was waived. See, e.g., Lanham, 171 S.W.3d at 28-29 ("where an admonishment is sufficient to cure an error and the defendant fails to ask for the admonishment, we will not review the error").

Next, Appellant argues that victim impact and background evidence was erroneously admitted during the guilt phase of his trial. Because he did not object to any of these alleged improper admissions of evidence, Appellant asks this Court to engage in palpable error review regarding this argument. RCr 10.26.

The Commonwealth is not permitted to introduce evidence which serves little or no legitimate evidentiary purpose other than to engender sympathy for the victim and his or her family. See, e.g., Ice v. Commonwealth, 667 S.W.2d 671, 676 (Ky. 1984). In interpreting this general prohibition, we have explained:

> A murder victim can be identified as more than a naked statistic, and statements identifying the victims as individual human beings with personalities and activities does not unduly prejudice the defendant or inflame the jury. Just as the jury visually observed the appellant in the courtroom, the jury may receive an adequate word description of the victim as long as the victim is not glorified or enlarged.

<u>Bowling v. Commonwealth</u>, 942 S.W.2d 293, 302 -303 (Ky. 1997) (internal citation omitted).

Appellant claims the following evidence was admitted improperly at trial and that, either individually or in accumulation, such error is substantial enough to entitle him to a new trial:

1.  Ray Martin, the individual who discovered Brown's body in his car, briefly volunteered during his testimony that he was emotionally impacted by the discovery of Brown's body and that he wished he could have forgotten about it.

2.  In response to tearful statements of remorse from Appellant during direct examination, the prosecutor stated during cross-examination, "so everyday his family wakes up, they wake up with reminders that he's not there anymore." Also, she made comments regarding the victim's life as compared to Appellant's life during closing arguments. Brown was described as a young man "loved by his family and friends." Appellant was described as a man without a job who possessed lots of guns and carried one on his person at all times.

3.  Josh Farrell, Brown's cousin, testified that he received a telephone call from Brown's mother who was in "hysterical shock" after learning of Brown's death and that he was in shock also regarding the death.

4.  Witnesses were permitted to testify that Brown had a family, had lots of friends, and had just graduated high school. The jury further heard testimony that Brown was attending Lexington Community College,

that he played basketball with his father, and that he moved in with his grandmother to help her out.

5.      Brown's mother and grandmother were tearful during their testimony. Additionally, Brown's mother informed the jury that she was very close with her son and that he told her that he "loved her very much" on the night he died.

A review of the record demonstrates that the witness testimony cited above was brief, scattered, and not significant in light of the fact that the overwhelming bulk of the testimony from these witnesses not cited by Appellant was relevant and served legitimate evidentiary purposes other than to engender sympathy.[1] Testimony from Brown's family members describing Brown's life, their reaction to his death, or their relationship with Brown was brief, unembellished, and none of it enlarged or glorified the victim. A review of the record reveals that Ray Martin's brief statement was spontaneous and volunteered. Finally, the prosecutor's comments are not significant or substantial enough to create manifest injustice affecting Appellant's substantial rights. On balance, we find this evidence to be proper in light of the context in which it was admitted or inadvertently admitted through legitimate examination. In any event, even if a portion of it was improper, it certainly does not rise, either individually or cumulatively, to the level of palpable error.

---

[1] Brown's family members offered probative testimony regarding the case in addition to their brief descriptions of the victim's personal characteristics. For example, family members testified regarding the following: (1) the timeline of Brown's actions that night and why he happened to be in that particular trailer park; (2) how Appellant became acquainted with Brown through Brown's friends and family; and (3) that Brown's family did not see or come across any belongings in Brown's possession which did not belong to Brown or which matched the items reportedly stolen from Appellant's residence.

10

## II. The trial court did not err regarding the introduction of photographs.

Appellant next argues the trial court erred in admitting (1) photographs of the victim; and (2) photographs of guns found in Appellant's home. Appellant contends that photographs of the victim were inflammatory and overly prejudicial. As for the photographs of Appellant's guns, Appellant argues they are irrelevant and also unduly prejudicial. For the reasons set forth herein, we disagree.

During Evidence Technician Tim Russell's testimony, the Commonwealth reviewed a brief series of photographs which depicted the victim in his vehicle as he was found on the night of his death. During this testimony, the trial court ordered a recess in order to allow the parties to take a break. Upon return from the recess, Appellant's counsel made two motions. First, he asked for a mistrial due to an emotional display that he stated he saw in the hallway. Second, he asked the trial court to prohibit the Commonwealth from displaying two additional photographs depicting a close up view of the victim's neck wound at autopsy. Appellant's counsel argued that these pictures would be "overkill." The Commonwealth explained that the two additional pictures were required to prove the following: (1) the cause of death; (2) the location of the bullet wound; and (3) the direction the bullet traveled before piercing the victim.

"The rule prohibiting the exhibition of inflammatory evidence to a jury does not preclude the revelation of the true facts surrounding the commission of a crime when these facts are relevant and necessary." Adkins v. Commonwealth, 96 S.W.3d 779, 794 (Ky. 2003). Here, the trial court ruled that the photographs in general were not overly gruesome and were relevant and necessary to prove the location of the victim's injury and how it caused his death. Appellant counters

11

that since he admitted killing the victim, it was unnecessary to prove the cause and nature of his death. However, we agree with the trial court that the probative value of the photographs was far outweighed by any potential prejudice caused by their display. See Barnett v. Commonwealth, 979 S.W.2d 98, 103 (Ky. 1998) ("[T]he prosecution is permitted to prove its case by competent evidence of its own choosing, and the defendant may not stipulate away the parts of the case that he does not want the jury to see."). Thus, no error occurred.

Appellant also cites as error the admission of photographs depicting several guns found in his home. He claims such photographs are irrelevant and highly inflammatory. The Commonwealth points out that the photographs were not introduced during its case-in-chief, but rather they were introduced during the cross-examination of Appellant. Without objection, the Commonwealth questioned Appellant's knowledge of firearms, his collection of various types of guns, his frequent trips to the firing range for target shooting, and the fact that he took "safety" classes in preparation for a "concealed carry" permit. The purpose of these questions, and the corresponding admission of photographs depicting Appellant's guns into evidence, was to prove Appellant's keen knowledge and skill with firearms, and thus, refute the likelihood of Appellant's claim that he did not intend to shoot Brown when he fired at Brown's vehicle. We agree that such questioning is relevant and that photographs used to assist the Commonwealth's questioning were probative enough to outweigh any counterbalancing prejudicial effect. KRE 403.

**III. The trial court did not err when it overruled Appellant's motion for a missing evidence instruction.**

12

Appellant claims that he was entitled to a missing evidence instruction because police released the victim's Pontiac Sunbird to his family approximately three weeks after the victim's death. Prior to releasing the vehicle, police conducted extensive processing on the vehicle, including taking numerous photographs / video, paint samples, projectile collection, and fingerprints. The contents of the vehicle were also documented and stored. Appellant claims that the vehicle was important to his case because it might have supported his testimony that the victim crashed into his vehicle prior to crashing into the other vehicles.

A missing evidence instruction is necessary "only when the failure to preserve or collect the missing evidence was intentional and the potentially exculpatory nature of the evidence was apparent at the time it was lost or destroyed." Estep v. Commonwealth, 64 S.W.3d 805, 810 (Ky. 2002). At a hearing on the matter, the trial court received testimony indicating that the police did not act outside of their ordinary procedures when they released the vehicle. Testimony also revealed that the vehicle was released because police believed that it had no additional evidentiary value after processing. The trial court thus found no bad faith on the part of the officers and determined that both the police and the Commonwealth were unaware that a collision might have occurred between the victim's vehicle and Appellant's vehicle at the time the Sunbird was released to the family. See Mills v. Commonwealth, 170 S.W.3d 310, 332 (Ky. 2005) (lack of bad faith precluded requiring a missing evidence instruction); Roark v. Commonwealth, 90 S.W.3d 24, 38 (Ky. 2002) ("absent some degree of

13

'bad faith,' the defendant is not entitled to [a missing evidence] instruction"). In light of these findings, a missing evidence instruction was clearly not warranted.

## IV. Opinion evidence was properly admitted.

Appellant argues the trial court erred in permitting Sergeant Jay Postlewaite to testify as an expert regarding his opinions on how damage occurred to the victim's vehicle. Of primary importance to Appellant, Officer Postlewaite opined that damage to the victim's vehicle was consistent with hitting the parked cars found at the scene of the crime. During rebuttal, Postlewaite was also permitted to opine, based on an examination of a photograph of Appellant's vehicle, that damage on the left front bumper of the vehicle appeared consistent with damage that is typically caused by forces acting from below the vehicle. Postlewaite then offered several examples in which damage can be caused from below the vehicle – such as "backing over a curb." Finally, Postlewaite opined that he would have expected to see more paint transfer on both vehicles and more parallel damage located higher up on Appellant's vehicle if the damage in the photograph was caused by the fender of another vehicle running into Appellant's vehicle.

Appellant complains that Postlewaite's testimony was unreliable and thus, inadmissible. See Ragland v. Commonwealth, 191 S.W.3d 569, 574 (Ky. 2006) (expert testimony not admissible unless it meets reliability standards of KRE 702). We review reliability determinations for clear error. Miller v. Eldridge, 146 S.W.3d 909, 916 (Ky. 2004). Upon review of the record, we find no clear error in the trial court's determination that Postlewaite's testimony met the threshold reliability standards set forth in KRE 702.

14

Appellant does not challenge whether Postlewaite is generally qualified, based on his significant training and experience, to offer opinions in the area of accident reconstruction. Rather, Appellant challenges whether Postlewaite conducted a sufficient investigation and analysis to support his opinions in this particular case. Notably, Postlewaite testified that since the fatality in this case was not caused by a vehicle collision (but rather a firearm), a formal accident reconstruction was not performed. His purpose at the scene of the crime, therefore, was not to perform an accident reconstruction but to collect evidence and document the scene for the purpose of conducting a homicide investigation.

Appellant argues that since all of the documentation and analysis generally performed in a formal accident reconstruction were not performed in this case, Postlewaite was not qualified to offer opinions regarding how any of the vehicles may have been damaged. Appellant further argues that a simple photograph of damage to Appellant's vehicle was not sufficient to allow Postlewaite to speculate as to how the damage may have been caused. We disagree.

Although he was at the scene for other purposes, Postlewaite testified that he was nonetheless qualified to offer opinions in the area of accident reconstruction since he was able to personally observe and analyze the scene, photographs, and other evidence. On cross-examination, Postlewaite noted that most, but not all, of the documentation and analysis involved in a formal accident reconstruction were performed in this case. Finally, Postlewaite testified that it was not unusual for him to be able to analyze and draw conclusions regarding the cause of damage to vehicles based on photographs alone.

15

The trial court concluded that although Postlewaite's investigation was not as extensive as it might have been had he performed a formal accident reconstruction, it was extensive enough to satisfy the minimum threshold requirements of KRE 702. It further ruled that Postlewaite's significant training and experience were sufficient to allow him to analyze and draw conclusions based on the photograph alone. We find no error in these admissibility determinations. As the trial court noted, Appellant's objections were appropriate to address the weight of Postlewaite's opinions, but were not sufficient to render his testimony completely inadmissible.

### V. There were no violations of constitutional rights.

Appellant next argues that his constitutional right to be free of warrantless searches was violated when the Commonwealth introduced evidence that Appellant refused to consent to fingerprint sampling. In Deno v. Commonwealth, 177 S.W.3d 753 (Ky. 2005), this Court held that it is unconstitutional to penalize a defendant for exercising his right to be free of warrantless searches. Id. at 762.

"In determining whether a constitutional right has been burdened impermissibly, it also is appropriate to consider the legitimacy of the challenged governmental practice." Jenkins v. Anderson, 447 U.S. 231, 238, 100 S. Ct. 2124, 65 L.Ed.2d 86 (1980). The facts in this case differ from those set forth in Deno, supra, in that Appellant's refusal to consent to fingerprint sampling was relevant for purposes other than to simply penalize him for the exercise of a legal privilege. Rather, the government utilized this evidence for the legitimate purposes of rebuttal and impeachment of a self defense claim advanced by Appellant at trial.

16

Specifically, the Commonwealth argued that Appellant's claim of self defense was not credible in light of the circumstances which transpired in this case. These circumstances included evidence which tended to show that Appellant initially did everything in his power to deny involvement, destroy evidence, and avoid prosecution. Only when these attempts failed, the Commonwealth argued, did Appellant change his story and claim self defense. The evidence regarding Appellant's refusal to consent to fingerprint sampling was introduced during a string of testimony which suggested that not only did Appellant fail to come forward with his claim of self defense despite several opportunities to do so, but also he took affirmative steps to undermine the investigation. Police testified that Appellant was initially cooperative with them, readily agreeing to talk and denying any knowledge of the circumstances surrounding the victim's death. However, when police mentioned that they recovered fingerprints from the scene and asked whether Appellant would mind providing fingerprint samples, Appellant suddenly became evasive and uncooperative.

Once Appellant submitted himself to cross-examination after claiming self defense at trial, it was not only appropriate but necessary for the Commonwealth to impeach Appellant's credibility and rebut his allegations. **As the traditional truth-testing devices of the adversarial process, impeachment and rebuttal are vital to ensuring a just and fair trial. Thus, preserving each party's right to utilize such devices at trial should weigh heavily when considering counterbalancing claims of "constitutional privilege."** See Jenkins, 447 U.S. at 238 ("Once a defendant decides to testify, '[t]he interests of the other party and

17

regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.'") (quoting Brown v. United States, 356 U.S. 148, 156, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958)).

Indeed, a similar governmental practice was condoned by the U.S. Supreme Court in Jenkins, supra. On trial for murder, the defendant testified that he killed in self defense. In an attempt to impeach the defendant's credibility, the prosecutor introduced evidence demonstrating that he failed to voluntarily come forward with his story until after he was apprehended by police two weeks after the murder. The U.S. Supreme Court held that use of the defendant's prearrest silence against him at trial was not unconstitutional since "impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial." Jenkins, 447 U.S. at 238.

In United States v. Robinson, 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988), the defendant's attorney argued several times during closing argument that the Government never allowed the defendant (who did not testify) to explain his side of the story. 485 U.S. at 26. In response, the prosecutor commented during his closing argument that the defendant "could have taken the stand and explained it to you." Id. The defendant's convictions were subsequently reversed on grounds that the prosecutor's comment regarding the defendant's failure to take the stand in his own defense violated the defendant's privilege against self-incrimination. Id. at 29. On appeal, the U.S. Supreme Court found no violation of any constitutional rights since the prosecutor's "reference to the defendant's opportunity to testify [was] a fair response to a claim made by

18

defendant or his counsel." Id. at 32. In so holding, the Court quoted Justice Stevens for the following principle: "the protective shield of the Fifth Amendment should [not] be converted into a sword that cuts back on the area of legitimate comment by the prosecutor on the weaknesses in the defense case." Id. (quoting United States v. Hasting, 461 U.S. 499, 515, 103 S.Ct. 1974, 1984, 76 L.Ed.2d 96 (1983) (Stevens, J., concurring) (citation omitted)).

Although Jenkins and Robinson involved the privilege against self-incrimination and whether arguments regarding its use violated either the Fifth or Fourteenth Amendments, the principles set forth therein aptly apply to this case and the determination as to whether these facts violated the Fourth Amendment and Section 10 of the Kentucky Constitution. Generally, such as in Deno, exercising one's privilege to be free of warrantless searches is simply not probative (or has low probative value) to a determination of guilt, and thus, the defendant's right to not be penalized for exercising such a privilege is paramount. See, e.g., United States v. Thame, 846 F.2d 200, 207 (3rd Cir. 1988), United States v. Prescott, 581 F.2d 1343, 1350-51 (9th Cir. 1978). However, in circumstances when such evidence is probative for some purpose other than to simply penalize the defendant for exercising a constitutional right, then notions of fair play and the need to preserve the truth-testing functions of the adversarial process may outweigh the defendant's interest in suppressing the evidence. See United States v. McNatt, 931 F.2d 251, 256 (4th Cir. 1991) (no Fourth Amendment violation where comments regarding defendant's refusal to permit search were in fair response to defendant's argument that drugs were planted by police in his vehicle); United States v. Dozal, 173 F.3d 787, 794 (10th Cir. 1999)

19

(no Fourth Amendment violation where comments regarding defendant's refusal to permit search were admitted for proper purposes and were not meant to simply penalize defendant for exercising a constitutional right - in this case, the evidence helped establish that defendant had dominion and control over the premises), Leavitt v. Arave, 383 F.3d 809, 828 (9th Cir. 2004) (comments regarding one's exercise of Fourth Amendment rights are generally improper unless such comments fairly rebut a claim by defendant - in this case, evidence showing that defendant was the only suspect who refused to voluntarily give a blood sample was properly admitted to rebut defendant's claim that he cooperated with the investigation). See generally, Kenneth J. Melilli, The Consequences of Refusing Consent to a Search or Seizure: The Unfortunate Constitutionalization of an Evidentiary Issue, 75 S. Cal. L. Rev. 901, 937 (2002) (arguing that the best approach to determining the admissibility of "refusal to consent" evidence is the rules of evidence).

On balance, we believe the facts in this case do not demonstrate a violation of Appellant constitutional rights under the Fourth Amendment or Section 10 of Kentucky's Constitution. The circumstances surrounding Appellant's refusal to voluntarily consent to fingerprint sampling were fairly admitted for the proper purposes of rebutting and impeaching Appellant's claim of self defense. Since we find that Appellant was not unfairly penalized for exercising a constitutional right, Appellant is not entitled to relief on this issue.

In any event, were one to argue error occurred, we find it to be harmless beyond a reasonable doubt. This case did not turn on the palm and fingerprints recovered from the victim's car. Appellant admitted placing his prints on the car

20

during an altercation with the victim. Also and most importantly, an integral part of Appellant's explanation of the evidence was that he initially took steps to destroy evidence, cover up the crime, and evade police. In addition to admitting that he was uncooperative in providing a sample of his fingerprints to police due to the fact that he knew his prints matched those found on the victim's vehicle, he testified that he fled the scene, disposed of his gun, canceled his cell phone, cleaned red paint off of his car, and removed glass from a partially shattered turn signal on his vehicle so that it could not be matched to glass found at the scene. Thus, not only were the circumstances surrounding Appellant's refusal to provide fingerprint samples undisputed, but also the evidence was cumulative in the sense that the jury already heard a plethora of evidence regarding evasive actions taken by Appellant.[2] Under these circumstances, we simply cannot see how there is any reasonable possibility that this evidence contributed to the jury's verdict. See Jarvis v. Commonwealth, 960 S.W.2d 466, 471 (Ky. 1998).

In a related argument, Appellant claims his Fifth Amendments rights were also violated during the following cross-examination of a detective conducted by Appellant's counsel:[3]

> Q.     Now, you did have a couple of interviews with [Appellant],
>        did you ever ask if there was anyone sitting in the vehicle
>        with him?

---

[2] Appellant's actions after the crime were never disputed at this trial, but rather it was the motive behind Appellant's actions which were disputed. Appellant claimed that his actions were motivated by fear for his life and fear that police would not believe his story; the Commonwealth claimed that Appellant's actions were motivated by a desire to hide his guilt.

[3] Appellant also complains that the prosecutor made an issue of his refusal to speak with police during opening statement, during the examination of another detective, and during closing argument. However, a review of the record proves that this is not accurate. Appellant's citations refer solely to his evasive actions regarding his reluctance to provide fingerprint samples.

A. No.
Q. You did not?
A. No.
Q. Did you ask Starla if there was anyone sitting in the vehicle, if she knew?
A. Yes.
Q. You did?
A. Yes, May 19th, May 19th.
Q. But in both interviews with [Appellant] you never asked him that?
A. He had no knowledge of how Brian Brown was killed.
Q. Okay. So you took it upon yourself to not ask that question then?
A. He refused to talk to me the second time.
Q. The first time he talked to you?
A. Yes.

Appellant contends that the detective's reference to his "refus[al] to talk to me the second time" was unconstitutional and constituted reversible error. We disagree. The detective's comment was in fair and direct response to questioning by Appellant's attorney. While the Commonwealth commented on Appellant's failure to come forward with his self defense claim sooner, it at no time made an issue of Appellant's specific refusal to talk with police after their initial interviews with him. In light of the case law set forth above, we find no violations of Appellant's Fifth Amendment rights in this case. See, e.g., Jenkins, supra; Robinson, supra.

Finding no error, the judgment and sentence of the Fayette Circuit Court is affirmed.

All sitting. Lambert, C.J.; Cunningham, Minton, Noble, Schroder and Scott, JJ., concur.

22

COUNSEL FOR APPELLANT:

Shannon Dupree
Assistant Public Advocate
Department for Public Advocacy
100 Fair Oaks Lane, Suite 301
Frankfort, KY 40601

COUNSEL FOR APPELLEE:

Gregory D. Stumbo
Attorney General

Matthew R. Krygiel
Assistant Attorney General
Office of Attorney General
Criminal Appellate Division
1024 Capital Center Drive
Frankfort, KY 40601